IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>     v.<br><br>CHRISTOPHER SELLS and TIMOTHY MURAWSKI,<br><br>          Defendants.<br>_____/ | No. C 11-4941 CW<br><br>ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND SELLS' MOTION TO STRIKE |

Plaintiff Securities and Exchange Commission (SEC) alleges that Defendants Christopher Sells and Timothy Murawski violated the Securities Act of 1933 (Securities Act) and the Securities Exchange Act of 1934 (Exchange Act), and the Rules promulgated thereunder.[1]  Defendant Sells files a motion to dismiss all the claims against him and a separate motion to strike the SEC's request for a director and officer bar.  Defendant Murawski joins in Sells' motion to dismiss.  The SEC opposes the motions.  Defendants file a joint reply.  The motions were heard on May 3, 2012.  Having heard oral argument on the motions and considered

_____

[1] In Curry v. Hansen Medical Inc., et al., C 09-5094 CW, a related case, Hansen Medical, Inc. shareholders bring a putative class action against several Hansen former officers, including Sells, for violating various sections of the Securities Exchange Act.  Defendants in that case move to dismiss the complaint.  The Court addresses that motion in a separate order.

**United States District Court**
For the Northern District of California

the papers filed by the parties, the Court denies Defendants' motion to dismiss and Sells' motion to strike.

BACKGROUND

The following are allegations taken from the SEC's complaint.

Defendant Christopher Sells is the former Senior Vice President (SVP) of Commercial Operations and Defendant Timothy Murawski is the former Vice President (VP) of Sales at Hansen Medical, Inc.  Hansen's primary product is the Sensei Robotic Catheter System (Sensei unit) which it sells to hospitals for use in cardiac surgical procedures.  In May 2007, sale of this product was approved by the Federal Drug Administration.

In April 2008, Hansen hired Sells to lead the sales organization.  In addition, Sells was in charge of a wide array of key operations, including clinical training, field services, installations, and customer service.  Sells was a member of Hansen's disclosure committee, which reviewed and provided comments on Hansen's press releases and SEC quarterly filings, including Hansen's annual forms that included its financial statements.

In about July 2008, Sells hired Murawski as Director of National Accounts, responsible for sales to large, national hospital chains.  In January 2009, Murawski assumed responsibility for all sales in the Midwest and Northeast, and was promoted to Vice President of Sales.  He reported directly to Sells.

From November 2007 through November 2009, Hansen maintained a policy, described to the public, for determining when revenue from the sales of Sensei units could properly be recognized, based on American Institute of Certified Public Accountants, Statement of Position 97-2 (SOP 97-2), Software Revenue Recognition.  Under Hansen's announced policy, revenue could be recognized for a sale only after the Sensei unit was installed at the customer's location and training of the customer end-user on the unit was complete.  Upon joining Hansen, Sells and Murawski were informed of the criteria that had to be met before Hansen could properly record revenue from a completed sale of a Sensei unit.

Due to the complexity of the Sensei unit, Hansen personnel spent one to two days at the purchasing hospital to install it properly.  When installation was complete, the field services group submitted to Hansen's finance department an installation completion form, signed by the Hansen installer and by a representative from the customer, which Hansen's customer service manager reviewed to ensure that it was completed properly.  At its facilities in California or Ohio, Hansen trained physicians from the purchasing hospitals on the proper use of the Sensei unit.  A representative of Hansen's clinical group, which was responsible for observational and hands-on clinical training, signed an acknowledgement form at the conclusion of the training, and obtained the trained physician's signature on the form.  The clinical group submitted the signed training form to Hansen's

3

finance department, where it was reviewed by Hansen's customer service manager to make sure it was completed properly.

To document that all steps for recording revenue from a sale had been completed, a Hansen senior accountant placed the installation and training forms in a revenue recognition file which included all of the documentation for the transaction. After completing review of the file, the senior accountant provided the file to Hansen's controller, who also reviewed the file to confirm that it was proper for Hansen to record revenue from the sale. At the end of each quarter, the revenue recognition files were provided to Hansen's independent audit firm. This firm reviewed the files to determine whether it agreed with Hansen's decision to record revenue from the sales. Each of the steps in Hansen's internal control process depended upon the truthful presentation of the evidence documenting all the terms of a transaction and the completion of installation of the Sensei unit and of the training of a physician at Hansen's facilities.

I. Transaction with Hospital A

It was important to Hansen to have a certain number of sales recognized in each quarter. In September 2008, Hansen sales staff was negotiating with Hospital A for the potential sale of a Sensei unit. Because Hospital A was in the midst of constructing a new lab where the Sensei unit would be installed, it asked to delay installation of the Sensei unit for six to nine months. At the direction of Sells and Murawski, a Hansen sales representative

4

proposed to Hospital A that the Sensei system be installed in a temporary location at the hospital.  In an email to Hospital A, the sales representative promised that Hansen would absorb and pay for the reinstallation of the Sensei unit in the new lab when construction was completed.  Sells reprimanded the sales representative for putting in writing Hansen's commitment to pay for reinstallation, because he understood that revenue could not be recognized when Hansen had an outstanding obligation to return to the hospital to reinstall the equipment.  In a conference call to Hospital A, Sells and Murawski agreed that Hansen would install the Sensei unit temporarily before September 30, 2008, but would then dismantle it and place it in storage at Hospital A.  Hansen would later install the unit permanently when the hospital's lab was ready, with Hansen paying all the additional costs.  Hospital A accepted this offer.  On September 26, 2008, Hansen personnel installed the Sensei unit and then took it apart and placed it into storage.  The Hansen installation personnel obtained the necessary signatures from Hospital A on the installation completion form.  The signed installation form, indicating that the Sensei unit had been properly and timely installed at Hospital A, was provided to Hansen's customer service department, where it was reviewed and passed to a senior accountant for review and then to the controller for review.  Neither Sells nor Murawski informed Hansen's finance personnel that the Sensei unit had been immediately dismantled and placed into storage and that Hansen was

obliged to perform another installation at Hospital A in the future. Following the finance department's review of the forms documenting the Sensei unit sale to Hospital A, Hansen recorded approximately $700,000 in revenue for the third quarter 2008. The installation completion form was also reviewed by Hansen's independent auditor. On or about October 23, 2008, Hansen publicly announced its results for 3Q08, in which it stated that it had recorded revenue for fourteen Sensei units and had generated revenues of $20.9 million, a 21.4% year-over-year increase. On October 23, 2008, Hansen management conducted a conference call with company investors and market analysts in which they repeated this information. In March 2009, Hansen personnel returned to Hospital A and installed the Sensei system in Hospital A's new lab, at Hansen's expense.

II. Transaction with Hospital B

In December 2008, Hansen was attempting to raise operating capital. Sells and Murawski were aware that Hansen needed to raise funds and believed that Hansen needed to show strong Sensei unit sales to help attract potential investors.

On December 19, 2008, less than two weeks before the last day of Hansen's 2008 fiscal year, Sells chastised Hansen's sales staff in an email for weak sales. Focusing on the number of Sensei units sold, Sells stated that "finishing below 12 systems would jeopardize Hansen's current funding efforts and require layoffs."

United States District Court
For the Northern District of California

Sells signed the email, "Grumpy Santa."  Murawski responded, "Well said!"

Hospital B had signed a purchase order agreeing to purchase a Sensei unit for $660,000, conditioned upon approval of the state in which Hospital B was located.  On December 24, 2008, one week before the last day of Hansen's fiscal year, Sells sent an email to Hospital B saying that there would be a price increase if the transaction did not close in 2008.  On December 27, 2008, Hospital B informed Sells that the state had approved the purchase of the Sensei unit.  However, Sells knew that, as of December 28, 2008, no doctors from Hospital B had been trained to use the Sensei unit and, thus, Hansen could not record revenue from the sale until 2009.  Sells and Murawski were aware of the practical impossibility of completing the full-day physician training at Hansen's facility several states away by December 31, 2008, in the middle of the holiday season and with no advance notice.  They instructed the Hansen clinical training representative assigned to Hospital B to obtain the Hospital B doctor's signature on the physician training form, no later than December 31, 2008.  Murawski indicated to the Hansen training representative that a forgery of the physician's signature would be acceptable.  The Hansen training representative forged the signature of one of Hospital B's doctors and sent the forged form to the Hansen customer service manager who reviewed it for completeness and then sent it to the finance department.  Hansen recorded the sale to

Hospital B during the fourth quarter of 2008, recognized revenue of $660,000 for the sale and included this revenue in its 2008 year-end financials.  In June 2009, Hansen training personnel completed the training of a Hospital B physician on proper usage of the Sensei unit.

III. Transaction with Hospital C

In December 2008, Hospital C expressed interest in buying a Sensei unit, but did not have sufficient funds to buy it at that time.  To complete the sale in 2008, Sells created a three-way transaction involving a leasing company with which Sells had a prior business relationship.  In December 2008, the leasing company entered into a leasing agreement with Hospital C.  The lease gave Hospital C the right to return the Sensei unit to the leasing company in six months by paying a minimal fee.  Sells verbally agreed that, if Hospital C returned the Sensei unit to the leasing company, Hansen would help market it and would make the leasing company whole.  The separate agreement Sells entered into on behalf of Hansen with the leasing company ran counter to Hansen's policy for sales and recording of revenues, which did not allow for contingencies.  On December 22, 2008, the leasing company sent a purchase order to Hansen agreeing to purchase a Sensei unit for $650,000.  The purchase order did not mention the separate agreement Sells had made with the leasing company in the event Hospital C returned the unit.  Following review of the purchase order by Hansen's senior accountant and controller,

United States District Court
For the Northern District of California

Hansen recorded $650,000 in revenue for 4Q08.  On March 3, 2009, Sells signed a letter, in connection with the independent accounting firm's audit of Hansen's 2008 year-end financial statements, that all oral or written side agreements for the year had been disclosed to the auditors.

IV. Transaction with Hospital D

In March 2009, Sells sent Hansen sales staff an email stating the importance of the first quarter 2009 sales results to Hansen's prospects for raising capital.  He stated that he expected sales staff to complete the sales of at least ten Sensei units by March 31, 2009.  Murawski was negotiating a sale to Hospital D, but it was not prepared to accommodate the installation of the Sensei unit.  To get around the installation requirement, Sells and Murawski arranged for Hansen personnel to install the Sensei unit at Hospital D but immediately to dismantle it and place it in storage until a later date when Hansen personnel would return to reinstall it at Hansen's expense.  Based on the temporary installation, Hansen personnel obtained the signatures from Hospital D personnel on the installation completion form.  This form was provided to Hansen's customer service department, which then passed it to the senior accountant and the controller. Hansen recorded the sale and recognized approximately $550,000 in revenue during 1Q09.

In April 2009, Hansen filed a prospectus supplement as part of an offer to sell Hansen common stock to the public.  The

prospectus incorporated the sales to Hospitals A through D and revenue from those sales. On April 22, 2009, Hansen sold more than 11.5 million shares of common stock to the public, resulting in approximately $35 million in net proceeds.

On November 16, 2009, Hansen filed restated financial statements for fiscal years 2007 and 2008 and for the first two quarters of 2009 (the Restatement). The Restatement disclosed that revenue from more than twenty sales transactions had been improperly reported, including the transactions involving Hospitals A, B, C and D.

The SEC brings the following claims for relief against both Sells and Murawski: (1) violations of § 10(b) of the Exchange Act and Rule 10b-5(a) for employing devices, schemes or artifices to defraud in connection with the purchase or sale of securities and of Rule 10b-5(c) for engaging in acts, practices or courses of business which operated as a fraud or deceit upon other persons in connection with the purchase or sale of securities; (2) violations of § 17(a)(1) and (3) of the Securities Act by engaging in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser of a security; (3) violations of § 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 for aiding and abetting Hansen in the making of untrue statements of material fact and omitting to state material information; (4) violations of § 13(b)(5) of the Exchange Act and Rule 13b2-1 for knowingly circumventing a system

of internal accounting controls and knowingly falsifying a book, record or account; (5) violating § 13(b)(2)(A) of the Exchange Act by aiding and abetting Hansen's failure to make or to keep books, records or accounts which accurately and fairly reflected its transactions and the disposition of its assets; and (6) violations of § 13(b)(2)(B) of the Exchange Act by aiding and abetting Hansen's failure to devise and maintain a sufficient system of internal accounting controls.  In addition, the SEC brings the following claims against Sells alone: (1) violations of § 10(b) of the Exchange Act and Rule 10b-5(b) for aiding and abetting Hansen, with scienter, in making untrue statements of material fact or omitting to state a material fact in connection with the purchase or sale of securities; and (2) violations of Rule 13b2-2 under the Exchange Act for making or causing to be made, while an officer of an issuer, a materially false or misleading statement or material omission to an accountant in connection with an audit, review or examination of the issuer's financial statements required to be made or the preparation of any document or report required to be filed with the SEC.

LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  On a motion under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable

claim and the grounds on which it rests.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff.  NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).  However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555).

When granting a motion to dismiss, the court is generally required to grant the plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile. Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246-47 (9th Cir. 1990).  In determining whether amendment would be futile, the court examines whether the complaint could be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint."  Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).

DISCUSSION

Defendants move to dismiss the first and third claims for relief under § 10(b) of the Exchange Act and § 17(A) of the Securities Act on the ground that the Supreme Court's decision in Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct.

2296 (2011), establishes that Defendants did not "make" a statement.  Defendants move to dismiss all claims on the ground that the allegations of fraud do not meet the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Sells also moves for dismissal of the aiding and abetting claim against him on the grounds that it fails to allege a primary violation by Hansen.

I. First Claim for Relief

Section 10(b) of the Securities Exchange Act makes it "unlawful for any person . . . to use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations the SEC may prescribe." SEC v. Zandfor, 535 U.S. 813, 819 (2002) (quoting 15 U.S.C. § 78j).  The congressional intent in passing this legislation was to inculcate a policy of full disclosure instead of the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.  Id.  The statute should be interpreted flexibly to effectuate its remedial purpose.  Id.  To be liable for a scheme to defraud, a defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme.  Simpson v. AOL Time Warner, Inc., 452 F.3d 1040, 1048 (9th Cir. 2006), vacated on other grounds sub nom. Avis Budget Gp. Inc. v. Cal. State Teachers' Ret. Sys., 552 U.S. 1162 (2008).

United States District Court
For the Northern District of California

13

**United States District Court**
For the Northern District of California

Rule 10b-5(a) and (c) implements the statute.  <u>Id.</u>  Rule 10b-5(a) forbids any person "to employ any device, scheme, or artifice to defraud."  17 C.F.R. § 240.10b-5(a).  Rule 10b-5(c) forbids any person "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5(c).  Rule 10b-5(b), which will be discussed more fully below, prohibits a person "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

Conduct itself can be deceptive, such that liability under Rule 10(b)-5(a) or (c) could be sustained without a specific oral or written statement.  <u>Stoneridge Inv. Partners, LLC v. Scientific-Atlanta</u>, 552 U.S. 148, 158 (2008); <u>SEC v. Lucent Technologies, Inc.</u>, 610 F. Supp. 2d 342, 358 (D.N.J. 2009). Generally a Rule 10b-5(a) and (c) claim cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim.  <u>WPP Luxembourg Gamma Three Sari v. Spot Runner, Inc.</u>, 655 F.3d 1039, 1057 (9th Cir. 2011).  "A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omission under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."  <u>Id.</u>

Defendants argue that, although <u>Janus</u> addressed a claim under Rule 10b-5(b), it also forecloses liability under Rule 10b-5(a)

and (c).  In Janus, the Court held that, for purposes of Rule 10b-5(b), "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  Id. at 2302.  The Court explained that, without control, a person can only suggest what to say, not make a statement in his or her own right.  Id.  The Court noted that this was exemplified by the relationship between a speechwriter and speaker; the speechwriter drafts the speech, but the speaker is responsible for its content and is the person who takes the credit or the blame for what is said.  Id.

Defendants argue that the SEC's claim is really based on nothing more than misstatements or omissions of material facts and that, by failing to allege that they made material misstatements or omissions, the SEC is attempting to plead around Janus, casting Defendants' conduct as a "scheme" rather than a misstatement under Rule 10b-5(b).  Defendants cite SEC v. Kelly, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011), for the proposition that "where the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission, courts have routinely rejected the SEC's attempt to bypass the elements necessary to impose 'misstatement' liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'"  The court reasoned that permitting the SEC to impose liability under subsections (a) and (c) for a scheme based upon an alleged false

United States District Court
For the Northern District of California

statement, when the defendant did not "make" the statement, would render the rule announced in Janus meaningless.  Id. at 344.

In Lucent Technologies, the court rejected a similar argument by the defendant there.  610 F. Supp. 2d at 359-60.  The court noted that, if the sole basis for a claim of scheme liability was alleged misrepresentations or omissions, then it could be said that the SEC was recasting its misrepresentation claim as a scheme claim to avoid the limitations on liability imposed in Janus.  Id. at 359.  However, there is no support for rejecting a claim against the architects of a fraudulent scheme, whose deception is communicated to the public.  Id. at 359-60.  The court rejected the notion that only deceptive conduct that was not communicated to the public is reachable under Rule 10b-5(a) and (c).  Id. at 360.

Here, the deceptive conduct alleged by the SEC goes beyond the making of material misstatements or omissions.  Although the purpose of Defendants' improper actions may have been to increase Hansen's sales and income figures, which they knew would be reported to the public, their allegedly deceptive acts amount to more than making a false statement.  Allowing liability for Defendants' alleged conduct under Rule 10b-5(a) and (c) would not make Janus meaningless because Janus did not address these sections, nor are these sections concerned with material misstatements or omissions, the subject addressed in Janus.

United States District Court
For the Northern District of California

Therefore, Defendants' motion to dismiss on the ground that Janus forecloses the Rule 10-b5(a) and (c) claims is denied.

## II. Third Claim for Relief

Section 17(a)(1) and (3) of the Securities Act provides, in relevant part:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails . . .
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> . . .
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a)(1) and (3).

Defendants make the same argument as they did in regard to the claims under Rule 10(b)5(a) and (c), that Janus forecloses liability against them under this section of the Securities Act. In SEC v. Daifotis, 2011 WL 3295139, *5-6 (N.D. Cal.), the court rejected this argument, noting that Janus only addressed alleged violations of Rule 10b-5(b), and the word, "make," on which Janus focused, is absent from the operative language of § 17(a).  See also SEC v. Mercury Interactive, LLC, 2011 WL 5871020, *3 (N.D. Cal.) (agreeing with Daifotis and disagreeing with Kelly).  This Court agrees with Daifotis and Mercury Interactive and holds that Janus does not apply to claims premised on § 17(a).  Defendants'

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

motion to dismiss the § 17(a) claim on the ground that it is precluded by <u>Janus</u> is denied.

III. Sells' Motion to Dismiss Second Claim for Aiding and Abetting

The SEC alleges that Hansen violated § 10(b) of the Exchange Act and Rule 10b-5(b) by making untrue statements of material fact or by omitting to state a material fact, with scienter.  The SEC claims that Sells, by means of the conduct set forth in the complaint, knowingly provided substantial assistance to Hansen's Rule 10b-5(b) violations.

Section 20(a) of the Exchange Act provides,

> Any person that knowingly provides substantial assistance to another person in violation of a provision of this title, or of any rule or regulation issued under this title, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

15 U.S.C. § 78t(e).

Sells argues that he cannot be liable for aiding and abetting Hansen's violations of § 10(b) and Rule 10b-5(b) because the SEC has not alleged a primary violation by Hansen.  Sells points out that, for Hansen to be liable for Rule 10b-5(b) violations, it must have acted with scienter in disseminating false information and, here, Hansen allegedly did not know the falsity of the financial statements that it issued.  He argues that his scienter cannot be imputed to Hansen, citing <u>In re Apple Computer, Inc.</u>, <u>Securities Litig.</u>, 243 F. Supp. 2d 1012, 2023, 1026 (N.D. Cal. 2003), and <u>Glazer Capital Mgmt. v. Magistri</u>, 549 F.3d 736, 745

(9th Cir. 2010), for the proposition that only the knowledge of the corporate officer who makes the alleged false and misleading statement can be imputed to the corporation.  Sells concludes that, because he is not alleged to have made the misleading statements, his scienter cannot be imputed to Hansen.

As pointed out by the SEC, the cases upon which Sells relies are not applicable here because they addressed, under the heightened pleading standard for fraud required by the Private Securities Litigation Reform Act of 1995 (PSLRA), the issue of whether a "collective scienter" theory could apply to establish that a company had scienter without specifically imputing any particular individual's scienter to it.  See Glazer, 549 F.3d at 744; In re Apple Computer, 243 F. Supp. 2d at 1023.  Although, in Glazer, the Ninth Circuit did not foreclose the possibility of imputing collective scienter to a corporation, it limited that theory to "circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." Police Retirement Systs. of St. Louis v. Intuitive Surgical, Inc., 2011 WL 3501733, at *12-13 (N.D. Cal.); In re Nvidia Corp. Securs. Litig., 2010 WL 4117561, at *10 n.10 (N.D. Cal.) (citing Glazer, 549 F.3d at 744).

Here, the theory of collective scienter is not at issue, nor is the SEC subject to the heightened pleading standard required by the PSLRA.  Sells' knowledge may be imputed to Hansen by

19

application of the doctrine of respondeat superior under which wrongful acts of an employee undertaken within the scope of employment can be imputed to the employer.  See e.g., Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1578 (9th Cir. 1990) (holding respondeat superior is a basis for vicarious liability in securities cases); Nordstrom, Inc. v. Chubb & Son, Inc., 54 F.3d 1424, 1434 (9th Cir. 1995) (same); see also In re Cylink Securs. Litig., 178 F. Supp. 2d 1077, 1088 (N.D. Cal. 2001) (Ninth Circuit authority holds that corporate entity can be vicariously liable under § 10(b) for fraud of its officers).

Further, the Supreme Court, in Janus Capital, distinguished aiding and abetting claims under 15 U.S.C. § 78(e), from claims under Rule 10b-5, on the grounds that aiding and abetting suits could be brought "against entities that contribute substantial assistance to the making of a statement but do not actually make it."  131 S. Ct. at 2302.

Therefore, the SEC's allegations are sufficient to show that Sells' scienter may be imputed to Hansen and, thus, the SEC has alleged a primary Rule 10b-5(b) violation against Hansen. Sells' motion to dismiss the second claim against him for aiding and abetting Hansen in making a material false statement or omission is denied.

IV. Particularity Under Rule 9(b)

Plaintiffs must plead any allegations of fraud with particularity, pursuant to Rule 9(b) of the Federal Rules of Civil

United States District Court
For the Northern District of California

Procedure.  In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1543

(9th Cir. 1994) (en banc).  If a plaintiff alleges "a unified

course of fraudulent conduct and relies entirely on that course of

conduct as the basis of a claim . . . the claim is said to be

'grounded in fraud' or to 'sound in fraud,' and the pleading of

that claim as a whole must satisfy the particularity requirement

of Rule 9(b)."  Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1103-

04 (9th Cir. 2003).  Here, all of the SEC's claims against

Defendants sound in fraud and so must be plead with particularity.

The allegations must be "specific enough to give defendants

notice of the particular misconduct which is alleged to constitute

the fraud charged so that they can defend against the charge and

not just deny that they have done anything wrong."  Semegen v.

Weidner, 780 F.2d 727, 731 (9th Cir. 1985).  Statements of the

time, place and nature of the alleged fraudulent activities are

sufficient, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1439

(9th Cir. 1987), provided the plaintiff sets forth "what is false

or misleading about a statement, and why it is false."  GlenFed,

42 F.3d at 1548.  Scienter may be averred generally, simply by

saying that it existed.  See id. at 1547; see Fed. R. Civ. P. 9(b)

("Malice, intent, knowledge, and other condition of mind of a

person may be averred generally").  As to matters peculiarly

within the opposing party's knowledge, pleadings based on

information and belief may satisfy Rule 9(b) if they also state

the facts on which the belief is founded.  Wool, 818 F.2d at 1439.

Rule 9(b) does not allow allegations about multiple defendants to be lumped together; when suing more than one defendant the allegations must inform each defendant separately of the allegations that surround his or her alleged participation in the fraud.  Swartz v. KPMG LLP, 476 F.3d 756, 764-65 (9th Cir. 2007). "As with 12(b)(6) dismissals, dismissals for failure to comply with Rule 9(b) should ordinarily be without prejudice." Vess, 317 F.3d at 1107-08.

The Court finds that the allegations about the four sales of Sensei units to hospitals, as summarized above, meet Rule 9(b)'s particularity requirements.  The allegations include the date of the fraudulent conduct, the nature of the fraudulent conduct, why it was fraudulent and the individual conduct on the part of Sells and Murawski.  Although Sells and Murawski argue that these allegations are insufficient to implicate them in a fraudulent scheme because it was the forged or inaccurate forms themselves and not their alleged actions that caused Hansen's accountants to recognize revenue prematurely, they ignore the allegations that they engaged in activities and directed others to act.  In turn, their activities or the concealment of their actions resulted in the misrepresentations to the market by others.

Therefore, Defendants' motion to dismiss based on Rule 9(b) is denied.

V. Sells' Motion to Strike

     Sells moves to strike from the SEC's prayer for relief the request to prohibit him from acting as an officer or director of any issuer that has a class of securities registered pursuant to § 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to § 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).  Sells argues that, because the first, second and third claims for relief against him must be dismissed, there is no basis for the SEC's request for such a Director and Officer (D & O) bar. The SEC responds that Sells is sufficiently alleged to be liable under the first three claims and, therefore, the D & O bar is properly requested.

     Pursuant to Federal Rule of Civil Procedure 12(f), a court may strike from a pleading "any redundant, immaterial, impertinent or scandalous matter."  Fed. R. Civ. P. 12(f).  The purpose of a Rule 12(f) motion is to avoid spending time and money litigating spurious issues.  Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir. 1993), reversed on other grounds, 510 U.S. 517 (1994).

     None of the claims against Sells has been dismissed and it is premature at this time to strike any prayer for relief. Therefore, Sells' motion to strike the request for a D & O bar from the prayer for relief is denied.

United States District Court
For the Northern District of California

CONCLUSION

Based on the foregoing, Defendants' motion to dismiss (Docket No. 25) and Sells' motion to strike (Docket No. 27) are denied.


IT IS SO ORDERED.


Dated: 8/10/2012

_____
CLAUDIA WILKEN
United States District Judge

**United States District Court**
For the Northern District of California

24